Filed 8/7/23  P. v. Ford CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JORDAN FORD,<br><br>Defendant and Appellant. | C096823<br><br>(Super. Ct. No. 16FE005069) |

Defendant Jordan Ford shot his high school friend multiple times and then drove off, leaving him bleeding in the street and paralyzed for life.  After defendant's case was transferred from juvenile court, a jury found defendant guilty of attempted premeditated murder, and found true that defendant personally and intentionally discharged a firearm, causing great bodily injury.  The trial court sentenced defendant to 39 years to life.  On appeal, defendant argues that (1) he is entitled to a new juvenile court transfer hearing under Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill 2361) (Stats. 2022, ch. 330, § 1) (Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a);

1

Welf. & Inst. Code, § 707); (2) his attempted murder conviction is not supported by substantial evidence; (3) the trial court erred by declining to apply Senate Bill No. 81's (2021-2022 Reg. Sess.) (Senate Bill 81) (Stats. 2021, ch. 721, § 1) amendments to his prior strike; and (4) the denial of his *Romero*[1] motion was an abuse of discretion.

We agree with defendant that Assembly Bill 2361 requires a conditional reversal and remand to the juvenile court for a new transfer hearing under the amended standard. If the juvenile court transfers the matter back to criminal court, then the matter is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The facts*

Defendant attended high school with his friends Kenneth, Tracy, "Fresno," and Deon. Defendant and Tracy were not only friends, but also cousins. The five teenagers would hang out together socially. One day, Deon stole something from Tracy. While there had been some tension in the group beforehand, Deon's theft put "the nail in the coffin" in Tracy's relationship with Deon. As a result, "bad blood" was created between Tracy and Deon.

The day after Deon stole from Tracy, Kenneth and Deon were walking down the street together, unarmed. As they walked, a red SUV pulled up, which Kenneth recognized as defendant's SUV. Kenneth saw that defendant was driving. Tracy, Fresno, and another person, Malik, also were in the car. As defendant pulled the SUV up to Kenneth and Deon, Malik displayed a chrome .22-caliber revolver to the two teens. Fresno displayed a .380-caliber pistol with a laser, which he covered with a towel. As they displayed their firearms, no one in the SUV said anything.

---

[1]      *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

Kenneth found it "real aggravating" that they "want to just shoot and shoot when we could fight" to settle any issues amongst them. Kenneth told them to get out of the car because he wanted to fight them, and he challenged Malik to a fight. Malik set the firearm down on the seat and got out of the car. Kenneth punched Malik multiple times, as Malik tried to dodge his punches. The other teenagers from the SUV exited the vehicle and stood by and watched, not saying anything. They did not try to stop the fight, nor did they warn that if the fighting did not cease, they might shoot their guns.

As Kenneth and Malik fought, Kenneth heard a gunshot. Kenneth realized he had been shot and started to run. A second gunshot hit Kenneth in the back, and a third shot hit Kenneth, paralyzing him, and he fell to the ground. Kenneth turned around and saw defendant pointing the revolver at him that Malik had left in the car. Kenneth believed that defendant must have gone back to the car and grabbed the gun while Kenneth was punching Malik. As Kenneth lay on the ground, defendant shot him again and said, "Kill that motherfucker."

Defendant then stood over Kenneth, so close that he was "on top of" Kenneth, and pointed the gun at Kenneth's head. Kenneth swiped at the gun with his hand, and defendant shot him in the finger. Defendant aimed the gun at Kenneth's head again and Kenneth heard the gun click as defendant pulled the trigger. Defendant was out of bullets.

Defendant ran to the car and yelled to Fresno, "Kill him, kill him," and, "Kill that motherfucker," referring to Kenneth. Kenneth was scared, crying, and screamed, "Don't shoot me." Fresno pulled the trigger, but his gun jammed. Defendant and the others who arrived with him returned to defendant's car and they drove away, leaving Kenneth lying in the street. Kenneth had been shot five to seven times, in the neck, chest, back, and finger. His wounds appeared to have been caused by a .22-caliber weapon. Kenneth was taken to the hospital. His injuries left him paralyzed from the waist down.

A man who lived near the shooting location testified that he heard gunshots and saw a red SUV with plastic on the rear window speed away, and then he saw Kenneth lying in the street. Another man testified that he was driving nearby, heard gunshots, and saw a man lying in the street.

After the shooting, police officers pulled over a red SUV with plastic on the rear window being driven by Malik. Police officers found a .22-caliber revolver and .380-caliber semiautomatic pistol in the SUV. The revolver had the capacity to hold six rounds. One casing from the pistol was recovered from the scene of Kenneth's shooting.

B. *Procedural history*

In March 2016, defendant was charged with attempted murder (Pen. Code, §§ 664, 187, subd. (a)),[2] and it was further alleged that defendant personally and intentionally discharged a firearm, causing great bodily injury. (§ 12022.53, subds. (b)-(d).) In 2017, defendant's criminal proceedings were suspended, and the matter was transferred to the juvenile court. In March 2019, the juvenile court granted the People's motion to transfer (Welf. & Inst. Code, § 707, subd. (a)(1)), and the criminal charges were reinstated.

In March 2022, a jury found defendant guilty of attempted murder, and further found true that defendant personally and intentionally discharged a firearm, causing great bodily injury. In a bifurcated proceeding, the trial court found defendant had a prior serious felony conviction from 2014 for robbery, which constituted a prior strike.

The trial court denied defendant's motion to dismiss his prior strike pursuant to Senate Bill 81, finding that the law "did not affect strikes as enhancements." At the continuation of his sentencing hearing, the trial court again declined to strike defendant's enhancement pursuant to Senate Bill 81 on the same grounds. It further denied defendant's *Romero* motion, finding defendant fell "squarely in the spirit of the three

---

[2]    Undesignated statutory references are to the Penal Code.

4

strikes law." The trial court also denied defendant's request to strike his gun use enhancement, finding it would not be in the interest of justice. However, it struck defendant's prior serious felony conviction based on the "[]new legislation involving multiple enhancements."

Ultimately, the trial court sentenced defendant to an aggregate term of 39 years to life in prison, comprised of seven years to life for attempted murder, doubled to 14 years to life per his prior strike conviction, plus a consecutive 25 years to life for the firearm enhancement.

DISCUSSION

I

*Assembly Bill 2361*

Defendant first contends, and the People concede, that the passage of Assembly Bill 2361 entitles him to a conditional reversal so that the juvenile court may conduct a second transfer hearing under the newly heightened standard. We agree with the parties.

When defendant was initially transferred to criminal court, the law required the prosecutor to establish by a preponderance of the evidence that "the minor should be transferred to a court of criminal jurisdiction." (Welf. & Inst. Code, § 707, former subd. (a)(3), as amended by Stats. 2018, ch. 1012, § 1; Cal. Rules of Court, rule 5.770(a).)[3] However, effective January 1, 2023, Assembly Bill 2361 amended Welfare and Institutions Code section 707 to both raise the prosecution's burden of proof for transferring a juvenile to criminal court, and to require a specific finding. It now states that the court must "find by clear and convincing evidence that the minor is not amenable

---

[3] As of the filing of this opinion, the Judicial Council has not revised California Rules of Court, rule 5.770(a) to conform to Welfare and Institutions Code amended section 707.

5

to rehabilitation while under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 707, subd. (a)(3).)

The parties agree, as do we, that Assembly Bill 2361 is retroactive to all cases not yet final on appeal pursuant to *In re Estrada* (1965) 63 Cal.2d 740. We addressed this question in *In re S.S.* (2023) 89 Cal.App.5th 1277, and noted that our Supreme Court had found that similar amendments to Welfare and Institutions Code section 707, "which prohibited prosecutors from charging juveniles with crimes directly in a court of criminal jurisdiction and gave the prosecution the burden of proof at transfer hearings . . . applied retroactively because they effectively reduced the possible punishment for juveniles . . . ." (*In re S.S., supra*, at pp. 1288-1289.) As Assembly Bill 2361 "likewise make[s] it more difficult to transfer juveniles from juvenile court, which similarly reduces the possible punishment for juveniles," we concluded in *In re S.S.*—as do we again here—that newly amended section 707 of the Welfare and Institutions Code applies retroactively to a minor's case that is not yet final. (*In re S.S.*, at p. 1289.)

As defendant is retroactively entitled to Assembly Bill 2361's ameliorative benefits, we conditionally reverse the judgment and remand for the juvenile court to conduct a new transfer hearing consistent with the current version of Welfare and Institutions Code section 707.

II

*Attempted Murder*

Defendant next contends that his conviction for attempted murder with premeditation and deliberation is not supported by substantial evidence, because there is no evidence that defendant planned the shooting or had motive to harm Kenneth. Defendant argues that the evidence instead reflects that he acted impulsively, without any preexisting reflection. We do not hesitate in concluding that substantial evidence supports the verdict.

6

A.    *Applicable legal principles*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  If the murder (or attempted murder) is "willful, deliberate, and premeditated," it is of the first degree.  (§ 189, subd. (a).)  " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.]  "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.  [Citations.]' [Citation.]  ' "Premeditation and deliberation can occur in a brief interval.  'The test is not time, but reflection.  "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " [Citation.]' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)  Attempted murder and first degree murder are subject to identical standards for substantial evidence review of premeditation and deliberation.  (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462-1463, fn. 8, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

In *People v. Anderson* (1968) 70 Cal.2d 15, relied on by the parties, our Supreme Court identified three categories of evidence that are typically sufficient to sustain a finding of premeditation and deliberation:  (1) planning evidence; (2) motive evidence; and (3) a manner of killing (or attempted killing) from which the jury could reasonably infer a deliberate intent to kill.  (*Id.* at pp. 26-27.)  However, "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive.  *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

B.    *Analysis*

Substantial evidence in each of the *Anderson* categories supports the jury's verdict here.  First, there is evidence of planning activity prior to the attempted murder.

Defendant drove two teens visibly armed with guns directly up to Kenneth and Deon. Malik and Fresno displayed their guns to Kenneth and Deon, which Kenneth understood to mean that they wanted to use guns to settle their issues, rather than just a fistfight. A jury could reasonably infer that because defendant brought armed accomplices to confront Kenneth and Deon, he planned to use those weapons to kill one or both of them. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 [defendant's act of bringing a firearm showed he considered the possibility of a violent encounter].) Further, although Malik left his gun in the SUV to engage in a fistfight with Kenneth, defendant retrieved the gun during the fight and then shot at Kenneth. Courts have consistently found that the act of retrieving a weapon supports an inference of planning activity. (See, e.g., *People v. Thomas* (1992) 2 Cal.4th 489, 517 [defendant engaged in planning activity by returning to his car to get rifle and ammunition before committing murders]; *People v. Wright* (1985) 39 Cal.3d 576, 592-593 [defendant confronted victim, returned to his trailer, obtained a loaded gun, and then looked for victim and shot him with little if any hesitation]; *People v. Gonzalez* (2012) 54 Cal.4th 643, 657, 664 [planning activity where defendant recruited accomplices to assault victim, drove to site of planned assault with a loaded gun, and when victim fought back, defendant cocked the rifle and handed it to her accomplice].) Moreover, when defendant pointed his gun at Kenneth's head and his gun failed to fire, he yelled to Fresno to "kill [Kenneth]." A jury could reasonably infer that defendant's command to kill Kenneth when he was unable to do so reflected a plan to not simply fight or shoot at Kenneth, but to murder him.

Next, the jury heard sufficient evidence establishing defendant's motive to kill. Deon had recently stolen something from Tracy, which created tension and "bad blood" between the two teens, causing a rift in the group. The following day, defendant saw Kenneth walking with Deon. A jury could reasonably infer that defendant perceived Kenneth's alignment with Deon as disloyal to defendant and the others. Indeed, a trier of fact could find that shortly before defendant shot Kenneth, Kenneth made his loyalties

8

clear by challenging defendant and his passengers to a fistfight rather than rejecting Deon in favor of the group. Kenneth's choice to stand by Deon during this period of heightened tensions, and fight the group instead of Deon, is sufficient for a jury to infer motive.

Finally, there is ample evidence from the manner of attack to support a finding of premeditation and deliberation. Defendant picked up a firearm and shot Kenneth in the neck while Kenneth was unarmed and unengaged with defendant. Kenneth ran away, yet defendant shot him twice more, hitting Kenneth's back and paralyzing him. As Kenneth lay on the ground, paralyzed and defenseless, defendant shot Kenneth again, and yelled, "Kill that motherfucker." Defendant then stood directly over Kenneth, aimed at his head, and pulled the trigger. When this attempted execution failed because his gun ran out of bullets, defendant called to Fresno multiple times to "kill him." This evidence that defendant, unprovoked by Kenneth, shot at Kenneth multiple times in the torso and neck areas, as Kenneth tried to flee and then lay helpless on the ground, is sufficient evidence for a rational trier of fact to infer premeditation and deliberation. (See *People v. Thompson* (2010) 49 Cal.4th 79, 114-115 [a close-range shooting without provocation or struggle reasonably supports inference of premeditation and deliberation]; *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 [sufficient evidence of premeditation and deliberation where the defendant "quickly fired three shots at the victim, with a shotgun, from a relatively close range"].) This is particularly so here, where defendant attempted a point-blank execution of Kenneth, and then yelled for Fresno to kill Kenneth and finish the job.

In sum, we cannot conclude that no rational trier of fact could have found premeditation and deliberation based on the evidence presented.

### III

*Senate Bill 81*

Defendant next contends that the trial court erred by denying his motion to strike his prior strike pursuant to Senate Bill 81. He asserts that prior strikes constitute "enhancements" under section 1385, as amended by Senate Bill 81, and thus are subject to strike. Defendant further argues that the newly amended section 1385 prohibited the trial court from imposing two enhancements by both doubling his sentence pursuant to his strike conviction and imposing punishment for the gun use enhancement. On these grounds, defendant seeks remand for resentencing. We are not persuaded.

Effective January 1, 2022, Senate Bill 81 amended section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674; see Stats. 2021, ch. 721, § 1.) Specifically, section 1385, subdivision (c) now requires the trial court to dismiss an enhancement if it is in furtherance of justice and requires the court to consider and afford great weight to evidence offered by the defendant to prove any of the specified mitigating circumstances. (§ 1385, subd. (c)(1), (2).) Further, it provides that, where multiple enhancements are alleged in a single case, "all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).)

Central to defendant's argument is his contention that his strike constitutes an "enhancement" within the meaning of section 1385. However, we recently held that the Three Strikes law is not an enhancement under section 1385, subdivision (c), but rather "an alternative sentencing scheme for the current offense." (*People v. Burke* (2023) 89 Cal.App.5th 237, 243.) Thus, section 1385, subdivision (c) does not provide a basis for the trial court to weigh evidence of defendant's mitigating circumstances to dismiss a prior strike, nor does it mandate dismissal of his prior strike (or his firearm enhancement)

10

as impermissible multiple enhancements. Accordingly, the trial court did not err by declining to apply section 1385, subdivision (c) to defendant's strike.

IV

Romero *Motion*

Defendant argues in the alternative that the trial court abused its discretion when it denied his *Romero* motion and declined to dismiss his prior strike at sentencing.[4] He avers that his individualized circumstances, such as his age at the time of his prior strike, his history of anxiety, and childhood trauma, place him outside the spirit of the law. We find no abuse of discretion.

A.    *Additional background*

Defendant filed an in limine motion and a sentencing brief in support of his *Romero* motion. He stated that he was only 14 years old when he committed his prior strike—armed robbery—and that he temporarily lived with his sister's parolee boyfriend at the time, who "groomed" defendant to engage in a series of robberies. He further asserted that he struggled with anxiety, depression, and behavioral problems, but he did not take his prescribed medication, and instead self-medicated with marijuana. His mother submitted a letter stating that defendant witnessed domestic violence as an infant and eight of defendant's close family members passed away between 2007 and 2011. Further, although defendant's father initially agreed to take custody of defendant after defendant was released from probation, his father had not been in contact with him at the time of defendant's release, so defendant moved back in with his mother.

At the sentencing hearing, defendant stated that he did well when he was "provided with everything and the help and the push and everything that [he] needed,"

---

[4]    The trial court considered the *Romero* motion simultaneously with defendant's request to strike the prior serious felony conviction (§ 667, subd. (a)) and gun use enhancement. (§ 12022.53, subd. (d).)

11

but when he was "failed by [his] dad and failed by Probation," everything "got bad." The probation report included a statement from the 71-year-old victim of defendant's 2012 armed robbery. She described that defendant and others, wearing masks and with weapons drawn, entered the hotel lobby where she worked. As the victim began to pray to Jesus, defendant shoved his gun in her face and said, "Shut up bitch." Defendant and the other robbers climbed over the counter, and she opened the cash drawer before she escaped and called 911. She tried but was unable to work afterwards due to the trauma she experienced.

The trial court considered all the evidence presented and arguments of counsel. The court took note of defendant's youth at the time of both offenses, as well as defendant's anxiety and the "very difficult" challenges he faced as a child that he failed to overcome. However, it found relevant that defendant admitted to participating in approximately 12 robberies in the period of a few months and had two "major write-ups" while in county jail, indicating that he still was not following the rules in the most secure settings. While the court acknowledged that some young people make poor choices, such as drinking or drug use, it opined that defendant was "moving into a different level" by committing violent crimes like robbery. With regard to the nature and circumstances of the crime, it found that defendant was the "primary person" in a "brutal crime," which was a "cold blooded almost execution, multiple shots." When defendant's gun ran out of bullets, he "encouraged somebody [else] to finish it off," which was "about as cold blooded" as the trial court had "ever seen."

Balancing the mitigating circumstances against other considerations, the court found he fell squarely within the spirit of the Three Strikes law.

B.    *Applicable legal standard*

In furtherance of justice, a trial court may strike or dismiss a prior conviction allegation. (§ 1385, subd. (a); *Romero, supra*, 13 Cal.4th at p. 504.) The court must consider "whether, in light of the nature and circumstances of his present felonies and

12

prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) The court also must consider the defendant's constitutional rights and society's interest in the prosecution of crimes. (*People v. Johnson* (2015) 61 Cal.4th 674, 688-689.) We review *Romero* motions under the deferential abuse of discretion standard, which requires defendant to show the sentencing decision was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) We presume the court considered all relevant factors in the absence of an affirmative record to the contrary. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

C.      *Analysis*

The trial court is not required to explain its reasons for denying a *Romero* motion. (*In re Large* (2007) 41 Cal.4th 538, 550.) Nonetheless, in this case, the trial court set forth an extensive explanation for its denial. The record reflects the trial court's proper consideration of relevant factors, including defendant's age, childhood trauma, familial circumstances, criminal history, recidivism, and nature of his crimes. It balanced his youth and difficult childhood against the heinous nature of his crime, the seriousness of his prior strike, and the numerosity of his rule breaking and his criminal acts. Nothing in the record indicates that the trial court was unaware of its discretion to strike, considered impermissible factors, failed to consider relevant factors, or rendered an arbitrary, capricious or patently absurd ruling. (*People v. Carmony, supra*, 33 Cal.4th at pp. 376-377.) Indeed, it was within the bounds of reason for the trial court to decide that defendant's prior armed robbery, followed by his cold-blooded attempt to execute his friend, rendering him paralyzed for life, along with his consistent inability to comply with the law and applicable rules, weighed against granting the *Romero* motion, even in light of defendant's youth and difficult upbringing.

In reaching this determination, we acknowledge that defendant was 14 at the time of his strike offense, and that, as defendant notes, California's laws have evolved in the direction of reduced culpability for youthful offenses. Nonetheless, none of the recently enacted legislation cited by defendant applied to him at sentencing. Thus, the trial court did not abuse its discretion by failing to apply those laws. Similarly, defendant fails to cite any authority stating that his age at the time of the offense, by itself, takes him outside the spirit of the Three Strikes law as a matter of law.

We therefore find no abuse of discretion in the trial court's denial of the *Romero* motion.

V

*Amending the Abstract of Judgment*

The parties agree, as do we, that section eight of the abstract of judgment does not accurately reflect the trial court's pronouncement of the sentence. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Specifically, the abstract of judgment incorrectly states that defendant was sentenced pursuant to section 667.61, rather than sections 667, subdivisions (b)-(i) and 1170.12. Accordingly, we order the abstract of judgment be corrected to reflect that defendant was sentenced pursuant to the Three Strikes law, which is properly referenced by checking the box stating, "PC 667(b)-(i) or PC 1170.12" in section eight. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

DISPOSITION

The judgment is conditionally reversed, and the matter is remanded to the juvenile court for reconsideration under Welfare and Institutions Code section 707, as amended by Assembly Bill 2361. If the juvenile court determines that transferring defendant's case to adult criminal court is not warranted, our conditional reversal is no longer conditional, and the juvenile court shall conduct all further proceedings to adjudicate the charges against him. However, if the juvenile court determines that the matter should be transferred back to criminal court, then the judgment is affirmed. In the event the matter

14

is transferred back to criminal court, the trial court shall correct the abstract of judgment to reflect that defendant was sentenced pursuant to sections 667, subdivisions (b)-(i) and 1170.12, rather than section 667.61, and shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


      KRAUSE      , J.


We concur:


  RENNER      , Acting P. J.


  BOULWARE EURIE  , J.